**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

OCT 2 7 2022

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CARLOS ALROY WOODLEY,                    )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        Civil Action No. 3:20-cv-993–HEH
                                         )
LARRY LEABOUGH, *et al.*,                )
                                         )
        Defendants.                      )

## MEMORANDUM OPINION
### (Granting in Part and Denying in Part Motions for Summary Judgment)

Carlos Alroy Woodley, a Virginia inmate proceeding *pro se* and *in forma*

*pauperis*, filed this 42 U.S.C. § 1983 action[1] (Compl., ECF No. 1) alleging that his rights

were violated while he was a pretrial detainee at the Riverside Regional Jail ("the Jail").

Specifically, Woodley raises the following grounds for relief:[2]

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects,
> or causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an action
> at law . . . .

42 U.S.C. § 1983.

[2] By Memorandum Opinion and Order entered on September 7, 2022, the Court dismissed all
claims against Defendants Puryear, Hamilton, Bain, Wyche, Fergunson, Plutro, Marshall, and
Lawson because Woodley failed to serve them in a timely manner. (ECF Nos. 68, 69.) In listing
Woodley's claims, the Court omits mention of any defendant that has been dismissed as a party
to the action. The Court employs the pagination assigned by the CM/ECF docketing system.
The Court corrects the capitalization, punctuation, and spelling in the quotations from the
parties' submissions. For Defendants, the Court utilizes the spelling of their name and their
position with the Jail, as set forth in the Motions for Summary Judgment. The Court omits any
secondary citations in the citations to the evidence submitted by Defendants in support of their
Motions for Summary Judgment.

| | |
|---|---|
| Claim One | On August 9, 2020, Lieutenant Whirley used excessive force against Woodley's person. (ECF No. 1 at 2–3.) |
| Claim Two | Lieutenant Nickelberry denied Woodley due process in conjunction with a hearing that was conducted on August 21, 2020. (*Id.* at 3.) |
| Claim Three | On August 26, 2020, pursuant to the orders of Superintendent Leabough, Sergeant Kindred, Captain Mells, Lieutenant Sample, Captain Peterson, and Sergeant Mayes, came to Woodley's cell to move him to the "ICA-Pod," remove his clothes, and place him in a suicide smock. (*Id.*) When Woodley refused to give up his clothes, these officers placed Woodley in a restraint chair for 4 hours. (*Id.*) |
| Claim Four | Woodley's rights were violated on August 27, 2020, when, (a) pursuant to the orders of Superintendent Leabough, Captain Mells, Sergeant Mayes, Captain Peterson, and Lt. Sample, told Woodley to give up his clothes and put on a suicide smock. (*Id.* at 4.) Woodley refused. (*Id.*) (b) Thereafter, Woodley was sprayed with tear gas. (*Id.*) (c) Then, the officers took off Woodley's clothes against his will and placed him back in a restraint chair for four hours. (*Id.*) (d) Subsequently, the officers placed Woodley in an empty cell with no mattress or blankets until the next morning on August 28, 2020. (*Id.*) |
| Claim Five | Woodley's rights were violated when, after he returned from court on August 28, 2020, and refused to give up his clothes: (a) Captain Smith and Lieutenant Talley placed Woodley in a restraint chair from August 28, 2020 at 6:00 p.m. until August 29, 2020 at 10:30 a.m. (*Id.*) (b) Major Mack ordered that Woodley be fed diet loaf for seven days. (*Id.*) |
| Claim Six | Woodley's rights were violated when: (a) Major Mack placed Woodley in a strip cell for 22 days on 24-hour lockdown. During this 22-day period, Woodley was denied, (i) clothes, (ii) personal property, (iii) a shower for nine days (iv) hygiene items, (iv) the ability to brush his teeth, (v) and, denied a mattress per the instructions of Superintendent Leabough. (*Id.*) |

> (b) When Woodley was allowed a shower, he had to shower with restraints on, per the instructions of Superintendent Leabough. (*Id.*)
> (c) Woodley was denied the ability to attend court appearances. (*Id.*)
> (d) Woodley was denied mail, lawyer visits, and phone calls. (*Id.*)

The matter is before the Court on the Motion for Summary Judgment filed by Defendant Nickelberry and the Motion for Summary Judgment filed by Defendants Leabough, Mack, Whirley, Talley, Kindred, Sample, Peterson, Mayes, Smith, and Mells. Woodley has not responded. (ECF Nos. 53, 57.) For the reasons set forth below, the Motions for Summary Judgment (*Id.*) will be granted in part and denied in part.

## I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for

trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).  In reviewing a summary

judgment motion, the Court "must draw all justifiable inferences in favor of the

nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th

Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However,

a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S.

at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

"[T]here is a preliminary question for the judge, not whether there is literally no

evidence, but whether there is any upon which a jury could properly proceed to find a

verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*,

81 U.S. at 448).  Additionally, "Rule 56 does not impose upon the district court a duty to

sift through the record in search of evidence to support a party's opposition to summary

judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v.

Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

At this stage, the Court is tasked with assessing whether Woodley "has proffered

sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof

of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)

(emphasis added).  The facts offered by an affidavit or sworn declaration must also be in

the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4)*.*  In this regard, the sworn

statement "must be made on personal knowledge, set out facts that would be admissible

in evidence, and show that the affiant or declarant is competent to testify on the matters

stated." *Id.*  Therefore, "summary judgment affidavits cannot be conclusory or based

upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.

1996) (internal citations omitted).  The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting a summary judgment analysis.  *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted).

In support of their Motions for Summary Judgment, Defendants have submitted a host of declarations and Jail records that the Court refers to by their CM/ECF designation.  Woodley did not respond to the Motions for Summary Judgment.[3]

In light of the foregoing submissions and principles, the following facts are established for the purposes of the Motions for Summary Judgment.  All permissible inferences are drawn in favor of Woodley.

## II.  Summary of Undisputed Facts

### A.    Housing at the Jail and Woodley's Initial Housing Assignments

Inmates at the Jail can be assigned to the general population, or the Restrictive Housing Unit ("R.H.U.").  (ECF No. 54–1, ¶ 3.)  R.H.U. provides a means of housing inmates whose behavior or needs, require housing other than general population.  (ECF

---

[3] Under the signature block in his Complaint, Woodley included the following statement:
> I have read the foregoing Complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

(ECF No. 1, at 7.)  This verification is virtually identical to one that this Court previously rejected in *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, *2–3 (E.D. Va. June 1, 2011), and is substantially similar to one that the United States Court of Appeals for the Fourth Circuit found to be lacking in *Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001).  As such, the Court must consider the contents of Woodley's Complaint as "mere pleading allegations." *Hogge*, 2011 WL 2161100, at *3 (quoting *Walker*, 11 F. App'x at 274).  Consequently, the Complaint fails to constitute admissible evidence. *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

No. 54–2 at 1.)  On October 1, 2019, Woodley was processed into the Jail and assigned to general population.  (ECF No. 54–1 ¶ 4.)

On March 24, 2020, Woodley was transferred to the R.H.U. and remained there until July 2, 2020.  (*Id.* ¶ 5.)  During this period in the R.H.U., Woodley engaged in numerous instances of misconduct, including repeatedly refusing orders, throwing foul liquids on staff, threatening to hang himself because of a delay in providing laundry soap, and repeatedly threatening and assaulting Jail staff.  (ECF No. 54–41 at 2.)

On July 2, 2020, Woodley was transferred back to general population.  (ECF No. 54–1 ¶ 6.)  Woodley remained in general population until August 9, 2020, when he refused to obey the orders of Jail staff and attacked Jail staff after they attempted to secure him in his cell as described below.  (*Id.* ¶ 7.)

**B.     Woodley's August 9, 2020 Assault on Jail Staff**

On August 9, 2020, Lt. Whirley was assisting in passing out medication in Woodley's housing unit.  (ECF No. 54–13 ¶ 2.)  "When staff opened Woodley's door, he exited his cell, approached the officer station, and stated he wanted his hour for recreation.  Sgt. Plutro and [Lt. Whirley] instructed Woodley that he needed to lockdown and return to his cell."  (*Id.*)

Woodley walked towards his cell but refused to go inside.  (*Id.* ¶ 3.)  Lt. Whirley tried to verbally coax Woodley into his cell.  (*Id.*)  Lt. Whirley then "instructed Woodley to lockdown or present his wrists to be handcuffed and he again refused.  Woodley then stated that he would 'knock the shit out' anyone that touched him."  (*Id.*)

Using a minimum of force, Lt. Whirley placed his forearm against Woodley's chest in order to push Woodley into the cell, while Sgt. Plutro attempted to shut the door to the cell. (*Id.* ¶ 4.)

> Woodley then stepped to the right and leaned on the door which caused both [officers] to land inside his cell. At that point, Woodley struck [Lt. Whirley] with a closed right fist to the left side of [his] face, knocking [his] glasses off. Lt. Whirley attempted to grab Woodley to keep him inside of the cell. Woodley struck [Lt. Whirley] again with a closed fist to the left side of [his] face. [Lt. Whirley] then let go of Woodley. The cell was dark and [Lt. Whirley] could no longer see.

(*Id.*) After Lt. Whirley got to the door of the cell, he saw Woodley "going after Officer Hamilton," who had been trying to assist. (*Id.*) Lt. Whirley wrapped his arms around Woodley's chest, in order to restrain him, and fell to the ground. (*Id.*) "Sgt. Plutro then deployed his OC spray which ended up hitting" Woodley and Lt. Whirley. (*Id.*) Woodley then went back to his cell, "gave up and allowed staff to cuff him." (*Id.*) Lt. Whirley never punched Woodley or used OC spray against him during this incident. (*Id.* ¶ 8.)

Based on Woodley's actions, Lt. Whirley instigated institutional charges for: assault on a staff member, failure to follow directions of Jail staff, failing to lockdown when instructed to do so, and creating a security disturbance which required staff to respond. (ECF No. 54–15 at 1.)

### C. Woodley's Status after the August 9, 2020 Incident

Following the August 9, 2020 incident, Woodley was transferred to the R.H.U. and placed on prehearing detention. (ECF No. 54–11 at 4.) "Prehearing detention is designated for inmates placed in R.H.U to await a disciplinary hearing when it has been determined their continued presence in general population poses a danger to themselves

7

to others, or the security of the facility.  Prehearing detention is not a punitive housing assignment." (ECF No. 58–1 ¶ 4.)  Lt. Nickelberry did not make the decision to transfer Woodley to prehearing detention, but she did conduct the investigation into the August 9, 2020 incident.  (*Id.* ¶ 5.)

In conducting the investigation, Lt. Nickelberry spoke to Woodley to allow him to present his version of the August 9, 2020 incident.  (*Id.* ¶ 6.)  Additionally, Lt. Nickelberry reviewed the surveillance video, spoke to Lt. Whirley and Sgt. Plutro, and reviewed the incident reports.  (*Id.* ¶¶ 7, 8.)  Based on this information, Lt. Nickelberry found Woodley guilty of the institutional charges and informed Woodley of her decision.  (*Id.* ¶ 9; ECF No. 58–4 at 1.)  Woodley was sanctioned with 60 days of lockdown for these offenses.  (ECF No. 58–4 at 1.)  Superintendent Leabough ordered that Woodley be placed on restrictive confinement status and 24-hour lockdown for a week.  (ECF No. 54–11 at 3.)  Additionally, Superintendent Leabough ordered that Woodley be limited to a smock and a safety blanket.  (*Id.*)

### D.    August 26, 2020 Use of the Restraint Chair

Woodley's behavior did not improve after the August 9, 2020 incident.  On multiple occasions, Woodley refused the commands of Jail staff "to lock down and/or return to his cell after recreation or returning from court."  (ECF No. 54–30 ¶ 3.)  On August 24, 2020, Woodley threatened to throw urine on Lt. Sample.  (*Id.*)  Later, Woodley threw a liquid out of his tray slot, causing the nurse to cease distributing medication.  (*Id.*)

On August 25, 2020, Lt. Sample instructed Woodley to return to his cell after recreation. (*Id.* ¶ 4.) Woodley refused and asked when he would be removed from R.H.U. (*Id.*) Lt. Sample told him that he would get Woodley an answer, but Woodley needed to return to his cell. (*Id.*) "Woodley removed the stick from the dust mop and wielded it as a weapon and told [Lt. Sample] that it was going to take more than four people to get him inside of his cell." (*Id.*)

Because of the above behaviors and his threats to hurt himself, on August 26, 2020, Superintendent Leabough ordered that Woodley would have his clothing items removed in exchange for safety blanket and a smock. (ECF No. 54–5 at 7.)[4] When Woodley refused to surrender his clothing, he was ordered to be placed in the restraint chair. (ECF No. 54–33 ¶ 3.) At 7:55 p.m., Sgt. Kindred assisted in placing Woodley in the restraint chair and monitored his confinement in the chair. (*Id.*) After roughly two hours, Woodley was released from the chair and allowed to walk around. (*Id.*) Two hours after the above break, Woodley was released from the restraint chair. (*Id.*) Lieutenat Sample and Captain Peterson were not involved in the decision to place Woodley in a suicide smock or in a restraint chair. (ECF No. 54–37 ¶ 3; 54–30 ¶ 5.)

### E.      August 27, 2020 Incident

Defendants Sample, Peterson, and Mells, deny any involvement with Woodley on this day. (ECF No. 54–30 ¶ 6; ECF No. 54–35 ¶ 5; ECF No. 54–37 ¶ 4.) Officer Mayes acknowledges that he was present as part of the extraction team to remove Woodley from

---

[4] Defendants asserts that Woodley also was placed on 24-hour lockdown. However, they fail to direct the Court to evidence in the record to support that fact.

his cell. (ECF No. 54–39 ¶ 4.)  Officer Mayes swears that he did not give the orders or

place the hose with OC spray into Woodley's cell.  (*Id.* ¶ 4.)  After Woodley came out of

his cell, Officer Mayes escorted Woodley to the showers to be decontaminated.  (*Id.*)

After decontamination, Woodley was escorted to the restraint chair.  (*Id.*)  Officer Mayes

never ordered or placed Woodley in the restraint chair.  (*Id.*)

### F.    Restraints to Woodley's Person after August 27, 2020

On August 28, 2020, because of Woodley's prolonged assaultive and disruptive

behavior, Major Mack "recommended that Woodley be placed on a 24-hour lockdown

under a Multi-Disciplinary Treatment Team ("MDDT") plan."  (ECF No. 54–40 ¶ 5.)

> Under the plan, Woodley was to remain in a safety smock and blanket
> in lieu of standard issued jail clothing and linen.  A safety smock is an
> alternative piece of jail clothing issued to inmates that are at risk of harming
> themselves.  The smock cannot be tied in a knot to cause harm. The smock
> does not restrict an inmate's arm movements.  Similarly, the blanket consists
> of thick material that also prevents inmates from tying it in a knot.  This
> recommendation was made due to Woodley's threats to harm himself and
> others.  Specifically, Woodley has threatened to hang himself.  He would
> also use clothing to clog the toilet to flood his cell and to cover the windows
> of his cell so that officers could not observe him. In addition, he was
> sometimes non-responsive during security rounds to make staff believe there
> was a medical emergency.

(*Id.* ¶ 6.)  Additionally, "[u]nder the plan, Woodley was not allowed out of his cell

without being fully restrained in handcuffs, waist chain and leg irons.  [Major Mack]

made this recommendation in accordance with policy to prevent Woodley from harming

himself and others and his refusal to lockdown." (*Id.* ¶ 8.)

Major Mack further recommended that Woodley be served diet loaf for one week.

(*Id.*  ¶ 7.)  "This recommendation was based on Woodley's previous incidents of using

food slots and utensils to throw unidentified liquids on staff.  Woodley would often times

state that these unidentified liquids contained feces and urine.  During the time of [this]

recommendation, Woodley continu[ed to] threaten[] to throw feces and urine at staff."

(*Id.*)

> Major Mack further directed that:
>
> Woodley would receive a shower three times a week with full restraints. According to policy, all inmates under Restrictive Confinement status are not allowed out of their cells without being placed in handcuffs, waist restraint and leg irons.   [Major Mack] was concerned that if Woodley was released from restraints during his shower, he would refuse to allow staff to restrain him after it was time to go back to his cell since he had done this on numerous occasions.  A review of the records indicate that on at least one occasion, Woodley was offered a shower but refused because he did not want to be restrained.  It was noted that Woodley used the sink to wash himself.

(*Id.* ¶ 9.)

> Major Mack's plan for Woodley:
>
> was to be reviewed by a MDDT team once a week and every subsequent week as necessary.  In addition, Woodley was to receive a weekly assessment from mental health personnel during the duration of his treatment plan.   The treatment plan also encouraged Woodley to meet certain behavioral goals so that he could return to normal restrictive confinement status.  Overall, the plan was implemented to protect Woodley and staff, and to maintain safety, security and order at [the Jail], not as a means of punishment.

(*Id.* ¶ 10.)

"In the afternoon of August 28, 2020, Woodley refused to surrender his clothing

after he returned from Court . . . ." (*Id.* ¶ 11.)  All inmates are required to be strip

searched after leaving the Jail in order to prevent contraband from entering the Jail. (ECF

No. 54–56 ¶ 3.)  To gain compliance with his instructions, Captain Smith told Woodley

that he would be placed in the restraint chair.  (*Id.*)  Woodley was secured in the restraint

chair at 5:52 p.m. (*Id.*) Lt. Talley assisted Captain Smith in securing Woodley in the restraint chair. (ECF No. 54–60 ¶ 3.) During the period that Woodley was in the restraint chair, the restraints were regularly checked. (ECF No. 54–25.) At 2:36 a.m., Woodley was provided a 30-minute stretching brake. (*Id.*) At 5:40 a.m., Woodley was provided with another stretching break, which he declined. (*Id.*) Woodley stated he would like to go back to his cell after breakfast and was willing to comply with orders of the staff. (*Id.*)

At 7:00 a.m. on August 29, 2020, when Captain Smith returned to work, he learned that Woodley was willing to comply with the orders of the Jail staff. (ECF No. 54–56 ¶ 4.) Captain Smith released Woodley from the chair and took him to a different cell to be strip searched and placed in a safety smock. (*Id.*) Woodley then stated that he was not going to strip until he was given a shower. (*Id.*) Captain Smith instructed staff to leave the cell, secured Woodley in the cell, and contacted Major Mack. (*Id.*) Major Mack instructed that Woodley should be placed back in the restraint chair and Jail staff should then remove his clothing. (*Id.*)[5]

Woodley was returned to the restraint chair without incident. (*Id.*) However, when Captain Smith informed Woodley that they would be removing Woodley's clothing, Woodley stated, "Don't ya'll try no fuck shit and don't be touching me." (*Id.*)

---

[5] Major Mack was worried that if staff tried to remove Woodley's clothing without the restraints, Woodley could have assaulted the staff. (ECF No. 54–40 ¶ 11.)

Captain Smith instructed the Jail staff to stand down and Woodley remained in the restraint chair. (*Id.*) At approximately 12:32 p.m., Woodley's clothes were removed. (*Id.*) Woodley was then returned to his cell and provided a safety smock. (*Id.*)

On August 30, 2020, Lt. Talley was speaking to Woodley at his cell. (ECF No. 54–60 ¶ 4.) Woodley was upset about receiving diet loaf. (*Id.*) Lt. Talley explained to Woodley that he did not control Woodley's diet. (*Id.*) Woodley then threw his food tray at Lt. Talley and the tray struck Lt. Talley in the leg. (*Id.*) Woodley was charged with the institutional offense of assaulting or instigating an assault on another person or staff. (*Id.*)

On August 31, 2020, Captain Peterson went to escort Woodley to the Video Arraignment Room for a Chesterfield County Court appearance. (ECF No. 54–37 ¶ 5.) Woodley became upset when Captain Peterson would not give him a shirt and a jumpsuit. (*Id.*) Woodley then stated, "That's alright Peterson, I'm going to take care of your ass in the street. You got it in here, but you ain't shit on them streets, you can't hide, don't think I can't find your ass. I'm not going to be in here forever and when I see you, I'm going to smoke your ass." (*Id.*) Captain Peterson and Lieutenant Mells continued to try to persuade Woodley to follow instructions. (*Id.*) Woodley told them to get Major Mack and stated he would "Smack the shit out of Major Mack." (*Id.*) Captain Peterson and Lieutenant Mells exited Woodley's cell and informed the Chesterfield County Courts of the situation. (*Id.*)

On September 10, 2020, after Woodley had been compliant with staff, it was recommended that Woodley be issued hygiene items, including a tooth brush, tooth paste,

13

linens, and all clothing. (ECF No. 54–11 at 1.) It was also noted that Woodley should be allowed to shower unrestrained. (*Id.*)

"Woodley was released from 24-hour lockdown status on September 16, 2020." (ECF No. 54–40 ¶ 12.) Major Mack never ordered that Woodley's mattress be removed and has no knowledge that Woodley ever went six days without a mattress. (*Id.* ¶ 13.) Major Mack never prevented Woodley from going to court or meeting with his attorney. (*Id.* ¶¶ 14, 15.) Major Mack never denied Woodley hygiene items or the opportunity to receive mail. (*Id.* ¶¶ 16, 17.)

Superintendent Leabough never denied Woodley the ability to attend a court appearance. (ECF No. 54–63 ¶ 5.) Superintendent Leabough never ordered that Woodley's mattress be removed or that Woodley be denied hygiene products. (*Id.* ¶¶ 6, 8.) Superintendent Leabough never prevented Woodley from receiving mail, meeting with his attorney, or receiving phone calls from his attorney. (*Id.* ¶¶ 7–9.)

### III. Analysis

In his Complaint, Woodley often asserts that Defendants violated his rights under the Eighth Amendment. However, the record rather plainly suggests that, at the time of the incidents alleged in the Complaint, Woodley was confined as a pretrial detainee. Defendants do not direct the Court to any evidence indicating that Woodley was confined as a convicted felon. Under the Fourteenth Amendment, a pretrial detainee may not be subject to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) ("A pretrial detainee must not be punished at all under the Fourteenth Amendment, whether through the use of excessive force, by deliberate

14

indifference to conditions of confinement, or otherwise."). Woodley's status at the time of any alleged violation controls what amendment applies rather than the amendment referenced by Woodley in his *pro se* complaint. *See Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Nevertheless, in moving for summary judgment, Defendants often rely upon Eighth Amendment jurisprudence without an explanation as to why that Amendment should govern the analysis of a particular claim. Additionally, without any explanation, at other points, Defendants concede that Woodley was a pretrial detainee and his claims are governed by the Due Process Clause of the Fourteenth Amendment. Given the facts established by the record, this distinction in not critical to the analysis of Claim One, but it is critical with respect to the legal analysis of the remaining claims.[6] *See Williamson v. Stirling*, 912 F.3d 154, 184–86 (4th Cir. 2018) (reversing district court's decision to dismiss pretrial detainee's due process claims); *see also Tate v. Parks*, 791 F. App'x 387, 390–91 (4th Cir. 2019) (same). In particular, Defendants have not directed the Court to any cases involving pretrial detainees and the use of a restraint chair, 24-lockdown, safety smocks, or diet loaf. Nor have they adequately applied the relevant Fourteenth Amendment jurisprudence to an analysis of Woodley's claims demonstrating that they are entitled to summary judgment.

---

[6] In Claim Two, Woodley contends that Lt. Nickelberry violated his right to *procedural* due process. Lt. Nickelberry's Motion for Summary Judgment with respect to that claim suffers from factual and legal deficiencies. The Court provides a brief discussion of those shortcomings so that, in the future, the parties properly address the facts and law that bear on this claim.

A.     **Claim One**

Allegations of excessive force against a pretrial detainee must be evaluated under

the Due Process Clause of the Fourteenth Amendment.  *See Goodman v. Barber*, 539

F. App'x 87, 89 (4th Cir. 2013) (citation omitted).  A detainee must show that the

defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr*

*v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks

omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010).  A

detainee may prevail by "providing only objective evidence that the challenged

governmental action is not rationally related to a legitimate governmental objective or

that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389,

398 (2015) (citations omitted).[7]  The factors that a court may consider to determine

whether force was objectively unreasonable may include:

> [1] the relationship between the need for the use of force and the amount of
> force used; [2] the extent of [the detainee's] injury; [3] any effort made by
> the officer to temper or to limit the amount of force; [4] the severity of the
> security problem at issue; [5] the threat reasonably perceived by the officer;
> and [6] whether the [detainee] was actively resisting.

*Id.* at 397 (third and eighth alterations in original) (citing *Graham v. Connor*, 490 U.S.

386, 396 (1989)).

"[O]fficers facing disturbances 'are often forced to make split-second

judgments.'"  *Id.* at 399 (citing *Graham*, 490 U.S. at 397).  Consequently, courts "must

judge the reasonableness of the force used from the perspective and with the knowledge

---

[7] In *Kingsley*, the Supreme Court determined that the appropriate standard is "only that the
officers' use of that force was *objectively* unreasonable," not that "the officers were *subjectively*
aware that their use of force was unreasonable."  576 U.S. at 391–92.

of the defendant officer." *Id.* (citation omitted) (internal quotation mark omitted). Courts recognize that "agents of the state are permitted to exercise a certain degree of force in order to protect the interests of society." *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir. 2013) (quoting *Justice v. Dennis*, 834 F.2d 380, 382 (4th Cir. 1987), *vacated on other grounds by* 490 U.S. 1087 (1989)). Thus, not every "push or shove, even if it may later seem unnecessary" is serious enough to rise to the level of a constitutional violation. *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008) (quoting *Graham*, 490 U.S. at 396), *abrogated on other grounds by Wilkins*, 559 U.S. 34.

As such, the Court "must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, 'we would give encouragement to insubordination in an environment which is already volatile enough.'" *Scarbro v. New Hanover Cty.*, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999)). In addition, the determination of whether an officer used excessive force must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397.

Woodley has completely failed to show that Lieutenant Whirley used excessive force against his person. Rather, as discussed below, the record demonstrates Woodley attacked Lieutenant Whirley and Lieutenant Whirley used a limited amount of force to secure his safety.

The first *Kingsley* factor requires the Court to examine "the relationship between the need for the use of force and the amount of force used." *Id.* The third factor requires

17

the Court to examine "any effort made by the officer to temper or to limit the amount of force." *Id.* The first use of force employed was Lieutenant Whirley's placement of his forearm against Woodley's chest in order to push Woodley into his cell. Clearly, some force was necessary as Woodley had repeatedly refused to comply with verbal commands to lock down in his cell. Further, the force employed was limited and calibrated to force Woodley to comply with the command to lockdown. Thus, the first and third factors clearly indicate that the force employed was not excessive. With respect to the remaining factors, this use of force did not injure Woodley and was a reasonable response to the security problem posed by Woodley, who was actively refusing to comply with Lt. Whirley's orders. Thus, all the *Kingsley* factors dispel the notion that this use of force was excessive.

The next use of force employed was not by Jail staff, but by Woodley who punched Lt. Whirley in the face after Lt. Whirley fell into his cell. Thereafter, Lt. Whirley grabbed Woodley to keep him inside the cell, and Woodley punched him in the face again, causing him to release Woodley. Lt. Whirley then saw Woodley poised to attack Officer Hamilton. Lt. Whirley responded by wrapping his arms around Woodley and falling to the ground. Woodley only ceased resisting when he was sprayed with OC spray.

Once again, all the *Kingsley* factors demonstrate that Lt. Whirley's use of force was objectively reasonable. Woodley was actively assaulting Jail staff and causing a major security problem. Nevertheless, Lt. Whirley responded with the minimum amount of force to bring Woodley to heel, grabbing and holding Woodley. It is not clear if those

actions resulted in any injury to Woodley's person.  Regardless, because Woodley fails to demonstrate that Lt. Whirley used excessive force against his person, Claim One will be dismissed.

### B.    Claim Two

As a pretrial detainee, Woodley has a right under the Due Process Clause to be free from punishment before his guilt is adjudicated. *See Bell*, 441 U.S. at 535.  The United States Court of Appeals for the Fourth Circuit explained that a pretrial detainee may raise a *substantive* due process challenge to his conditions of confinement.  *See Williamson*, 912 F.3d at 174–76.  Such a challenge requires the pretrial detainee to demonstrate that his or her conditions of confinement "are so disproportionate or arbitrary that they are not related to legitimate penological objectives and amount to punishment." *Tate*, 791 F. App'x at 390 (citing *Williamson*, 912 F.3d at 174–76).  To survive summary judgment, the "detainee must show that the challenged treatment or conditions were either (1) imposed with an express intent to punish, or (2) not reasonably related to a legitimate nonpunitive objective, in which case an intent to punish may be inferred." *Id.* (citing *Williamson*, 912 F.3d. at 178).

In addition to the substantive due process challenges discussed above, "a pretrial detainee may assert a procedural due process violation based on the conditions of his pretrial confinement." *Id.* (citing *Williamson*, 912 F.3d at 174–76).  The Fourth Circuit explained:

> Jail officials may impose nonpunitive restrictions on a pretrial detainee for disciplinary or administrative reasons, but, as these restrictions implicate a detainee's liberty interests, he is entitled to certain procedural protections.

19

> *Id.* at 174–75. Where restrictions are imposed as a disciplinary measure of institutional misconduct, the detainee must be provided notice, a hearing, and a written explanation of the disciplinary action taken. *Id.* at 176. Where such restrictions are imposed instead for administrative reasons, the detainee is owed some notice of the proposed action and an opportunity to present his views. *Id.* at 175–77. In addition, the detainee must be afforded periodic review of his confinement. *Id.* at 176–77.

*Id.*

In Claim Two, Woodley asserts:

> On August 21, 2020, a partial hearing was done by [Lt.] Nickelberry. In this hearing, [Lt.] Nickelberry spoke with witnesses who verified that Lt. Whirley did in fact place his hands on me to get me inside of cell. [Lt.]. Nickelberry stated . . . she needed to speak with Major Mack about situations as such, and was continuing the hearing until the following Monday. I never heard anything back about this hearing. I was never afforded a chance to appeal any decision made. I was in segregation 12 days before this partial hearing which violates Riverside Regional Jail policy. You are supposed to be served a charge within seven 7 days . . . it violates due process.

(ECF No. 1 ¶ 11 (emphasis omitted).)

Lt. Nickelberry argues, and the Court agrees, that Woodley appears to be asserting that she denied him procedural due process in conjunction with the decision to convict him of multiple institutional infractions. (ECF No. 58 at 5.) Lt. Nickelberry then provides a general outline of due process principles without any adequate explanation as to why she is entitled to summary judgment under the relevant facts and the law.

"[A] pretrial detainee may not be disciplined in the absence of some level of due process." *Williamson*, 912 F.3d at 182 (citation omitted). As noted above, the level of process due depends upon whether a restriction is disciplinary or administrative.

> To determine whether a particular restriction is disciplinary — rather than administrative — the courts again consult the framework of *Bell*, which guides that inquiry for procedural as well as substantive due process claims.

>    Such courts must ask whether the restriction is expressly punitive, or whether
>    a punitive intent may be inferred because the restriction is not reasonably
>    related to a legitimate, nonpunitive purpose.

*Id.* (citing *Dilworth v. Adams*, 841 F.3d 246, 252–53 (4th Cir. 2016)).  Here, based on

Woodley's actions, Lt. Whirley instigated institutional charges for:  assault on a staff

member, failure to follow directions of Jail staff, failing to lockdown when instructed to

do so, and creating a security disturbance which required staff to respond.  (ECF No. 54–

15 at 1.)  Thereafter, Woodley "was found guilty" of these charges and sanctioned with

60 days lockdown.  (ECF No. 58–4 at 1.)  Such language indicates pretty clearly that

Woodley's 60 days of lockdown were disciplinary action for his misconduct.[8]  "Where

restrictions are imposed as a disciplinary measure of institutional misconduct, the

detainee must be provided notice, a hearing, and a written explanation of the disciplinary

action taken."  *Tate*, 791 F. App'x at 390 (citing *Williamson*, 912 F.3d at 176); *see*

*Dilworth*, 841 F.3d at 253 (emphasis added) (specifying that a detainee is  entitled "to

*written* notice of the alleged disciplinary violation at least 24 hours before the hearing,

and, after the hearing, to a *written* statement describing the reasons for the disciplinary

action taken" (citing *Wolff*, 418 U.S. at 563–65)).  The record is not clear as to whether

Woodley received any of these procedural protections.  Lt. Nickelberry fails to direct the

Court to evidence that Woodley was provided written notice of the charges or a written

---

[8] Lt. Nickelberry argues that, although Woodley received "sixty days of sanctions, his continued placement in R.H.U. was for administrative purposes" because of his MDDT plan.  (ECF No. 58 at 7.)  Lt. Nickelberry, however, fails to direct the Court to record evidence that reflects the conditions of the MDDT plan were more restrictive than the sanctions imposed after her finding of guilt.  Moreover, Lt. Nickelberry fails to direct the Court to the law that governs the analysis of procedural due process claims such as Woodley's where the restrictions to his confinement flow from disciplinary misconduct and administrative purposes.

statement of her reasons for the disciplinary action taken. Also, it is not clear whether Lt. Nickelberry provided Woodley with a hearing, or merely interviewed him during the course of her investigation. Lt. Nickelberry does not suggest she conducted a hearing. [9] Given this record and the current briefing, Lt. Nickelberry's Motion for Summary Judgment with respect to Claim Two will be granted in part and denied in part.[10]

### C.    Defendants Not Involved in the Remaining Claims

As noted above, Defendants' legal arguments for dismissal of the remaining claims are generally inadequate as they have not briefed the controlling jurisprudence. Nevertheless, with respect to the remaining claims, it is appropriate to dismiss those Defendants, who as a factual matter, are not responsible for any alleged violation.

With respect to Claim Three, the record reflects Captain Mells, Officer Mayes, Lieutenant Sample, and Captain Peterson were not involved in the decision to place Woodley in a safety smock and then in a restraint chair on August 26, 2020. Accordingly Claims Three will be dismissed with respect to Defendants Mells, Mayes, Sample, and Peterson. Claim Three will proceed only against Superintendent Leabough and Sergeant Kindred.

---

[9] To the extent that Woodley contends that Lt. Nickelberry is liable for his initial transfer to the R.H.U. for administrative prehearing segregation, Lt. Nickelberry swears she was not involved in that decision. Accordingly, Lt. Nickelberry will be granted summary judgment with respect to this aspect of Claim Two.

[10] The current briefing is also inadequate to determine whether Lt. Nickelberry is entitled to qualified immunity. *See Fisher v. Neale*, No. 3:10CV486–HEH, 2010 WL 3603495, at *3 (E.D. Va. Sept. 8, 2010) (explaining proper methodology for briefing a qualified immunity defense (citing *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990))).

With respect to Claim Four, the record reflects that Captain Mells, Captain Peterson, and Lt. Sample were not involved in the incident on August 27, 2020, where Woodley was placed in the restraint chair after he refused to surrender his clothes and don a safety smock. Accordingly, Claim Four will be dismissed with respect to Defendants Mells, Peterson, and Sample. Claim Four will proceed only against Superintendent Leabough and Officer Mayes.

With respect to Claim Six, neither Superintendent Leabough nor Major Mack denied Woodley hygiene items, the ability to brush his teeth, a mattress, mail, visits with his lawyer, or the ability to attend court appearances. Accordingly, those aspect of Claim Six will be dismissed.

Thus, the remaining aspects of the claims before the Court are as follows:

| | |
|---|---|
| Claim Two | Lt. Nickelberry denied Woodley procedural due process in conjunction with a hearing that was conducted on August 21, 2022. (ECF No. 1 at 3.)[11] |
| Claim Three | Woodley's rights under the Fourteenth Amendment were violated when, on August 26, 2020, pursuant to the orders of Superintendent Leabough, Sergeant Kindred came to Woodley's cell to move him to the "ICA-Pod," remove his clothes, and place him in a suicide smock. (*Id.*) When Woodley refused to give up his clothes, officers placed Woodley in a restraint chair for 4 hours. (*Id.*) |
| Claim Four | Woodley's rights under the Fourteenth Amendment were violated when, on August 27, 2020, pursuant to the orders of Superintendent Leabough, Officer Mayes and other officers (a) told Woodley to give up his clothes and put on a suicide smock. (*Id.* at 4.) (b) When Woodley refused, Woodley was sprayed with tear gas. (*Id.*) |

---

[11] *See* footnote 8 for the portion of this claim that was dismissed.

                    (c) Then, the officers took off Woodley's clothes against his will and placed him back in a restraint chair for four hours. (*Id.*)

                    (d) Subsequently, the officers placed Woodley in an empty cell with no mattress or blankets until the next morning on August 28, 2020.  (*Id.*)

Claim Five         Woodley's rights under the Fourteenth Amendment were violated when, after he returned from court on August 28, 2020, and refused to give up his clothes:

                    (a) Captain Smith and Lieutenant Talley placed Woodley in a restraint chair from August 28, 2020, at 6:00 p.m. until August 29, 2020, at 10:30 a.m.  (*Id.*)

                    (b) Major Mack ordered that Woodley be fed diet loaf for seven days.  (*Id.*)

Claim Six          Woodley's rights under the Fourteenth Amendment were violated when:

                    (a) Major Mack placed Woodley in a strip cell for 22 days on 24-hour lockdown.  During this 22-day period, Woodley was denied, (i) clothes, (ii) personal property, and (iii) a shower for nine days.

                    (b) When Woodley was allowed a shower, he had to shower with restraints on, per the instructions of Superintendent Leabough.  (*Id.*)

## IV. Conclusion

For the foregoing reasons, the Motion for Summary Judgment filed by Lt. Nickelberry (ECF No. 57) will be granted in part and denied in part.  The Motion for Summary Judgment filed by the remaining Defendants (ECF No. 53) will be granted in part and denied in part.  The Clerk will be directed to terminate Defendants Whirley, Mells, Peterson, and Sample as parties to this action.  Within twenty (20) days of the date of entry hereof, Woodley will be directed to provide a statement reflecting the date of any conviction within the last eight years.  The failure to provide that information will result in the dismissal of the action.  *See* Fed. R. Civ. P. 41(b).  Within fifty (50) days of the

date of entry hereof, Defendants shall file a new motion for summary judgment that corrects the deficiencies identified above. The Motion of Simone T. Williams to withdraw as attorney for Defendants (ECF No. 59) will be granted.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: Oct. 27, 2022
Richmond, Virginia